IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY – TRENTON VICINAGE

| | |
|---|---|
| GLEN W. WEST, SR. | : Civil Docket No.: 3:11-cv-00819-JAP-DEA |
| *Plaintiff,* | : |
| v. | : **AFFIDAVIT OF TIMOTHY J. RINKE** |
| GENERAL MOTORS LLC, | : ELECTRONICALLY FILED |
| *Defendant.* | : |

STATE OF CONNECTICUT:
                                   :
COUNTY OF FAIRFIELD   :   SS

Timothy J. Rinke being first duly sworn according to law, deposes and states the following:

1. I am employed by General Motors LLC as a Portfolio Manager in its Motors Holding organization. Prior to working at General Motors LLC ("GM"), I was employed by General Motors Corporation in its Motors Holding organization as well as other groups in the corporation. In total, I have worked for General Motors Corporation and General Motors, LLC for 27 years.

2. In my capacity as Motors Holding Portfolio Manager, I am familiar with the Motors Holding Investment Plan in general and with the investment that Motors Holding made with plaintiff Glen West, which forms the basis of this lawsuit.

3 GM is a manufacturer of automotive products which it distributes through a network of motor vehicle dealerships. Motors Holding is a group within GM which invests

resources with (what it believes are) qualified candidates in viable business opportunities to grow retail talent and to provide an opportunity for individuals to become independent GM dealer operators. GM recognizes that there are individuals who could be quality dealer operators but who do not have access to sufficient capital (an essential ingredient of success) to independently invest in a motor vehicle dealership. Through its Investment Plan, Motors Holding provides investment capital to these candidates. The ultimate goal is for the dealer operator to buy out Motors Holding over time using the profits generated from the business.

4. Currently, a dealer operator is required to invest a minimum of $350,000 or 15% of the total dealership capital shown in the business plan, which ever is greater. Motors Holding provides the balance of the required capital.

5. When notification is received that GM's sales and marketing organization has approved the candidate, and the Motors Holding Investment Committee has approved the investment, typically a new corporation will be organized or the stock of an existing company may be purchased (the "Dealer Company"). At that time, the dealer operator and Motors Holding will execute documents including the Stockholders Agreement which sets forth in detail, among other things, the terms and basis through which both the dealer operator and Motors Holding agree to invest in the dealer company, and, ultimately, actually make the investment in the Dealer Company.

6. Typically, the dealer operator, the Motors Holding Portfolio Manager, and one additional representative of Motors Holding will be elected as directors and they in turn will elect the officers of the Dealer Company. The dealer operator will be elected as President of the Dealer Company and manages the day to day affairs of the business and is required to sign an Acceptance of Office confirming that he or she will devote substantially all capabilities and time

to the Dealer company's business operations; that he or she will not commingle or share any assets of the Dealer Company with the assets of any affiliate of the President or member of the President's family: and, that the President will abide by the By-Laws and Policies of the Dealer Company.

7. Typically, the comptroller is elected Secretary- Treasurer of the dealer company and is required to maintain the Dealer Company's books and records in accordance with the policies adopted by the Board of Directors. It is the responsibility of both the President and the Secretary-Treasurer to provide accurate and timely financial information to the Board of Directors and Stockholders.

8. The Motors Holding Portfolio Manager is available to consult with and to advise the Dealer Operator during the entire investment period on matters of dealership operations. In addition, the Motors Holding Portfolio Accountant will periodically review the financial records and internal controls of the Dealer Company. In addition, the Dealer Company's independent auditor is required to produce annual certified financial statements, prepare the Dealer Company's tax returns, as well as perform interim review of the books and records of the Dealer Company. Motors Holding requires that the Dealer Company adhere to the General Motors Dealer Standard Accounting System.

9. Motors Holding first entered into an investment with a Dealer Company in which Glen West was the dealer operator at Capital Chevrolet, Inc. d/b/a Patterson Chevrolet located in Hamilton Square, New Jersey. The Stockholders Agreement for that investment was executed in 1998. Motors Holding maintained an investment in Patterson Chevrolet until 2004, when its remaining stake in the Dealer Company was retired.

10. Motors Holding next entered into an investment in a Dealer Company in which Glen West was the dealer operator at Superior Chevrolet, Inc., located in Lawrenceville, New Jersey. The Stockholders Agreement for that investment was executed in 2005. Motors Holding maintained an investment in Superior Chevrolet until 2006 when its remaining stake in the Dealer Company was retired.

11. Motors Holding re-invested with Glen West in Superior Chevrolet. The Stockholders Agreement for that investment was executed in 2008. Under the terms of the Stockholders Agreement, Glen West invested $261,000 and received slightly more than 15% ownership interest and Motors Holding invested $1,401,400 and received slightly less than 85% ownership interest in the Dealer Company.. As part of that transaction, GM's Dealer Network Planning and Investment Group paid Glen West $1,050,000 to terminate the Patterson Chevrolet dealer point. In addition, GM provided an interest free loan of $650,000 to Glen West to cover carrying costs for two years on the real estate on which Patterson Chevrolet was located, to give Mr. West a sufficient opportunity to sell the real estate. In 2010, GM extended the loan for an additional year with the same terms. In addition, Motors Holding made a $203,852 donation to capital to reimburse the Dealer Company for losses incurred from June to September, 2008.

12. In 2009, GM re-evaluated corporate assets as part of its "fresh start" accounting initiative in an attempt to accurately reflect the value of the assets and liabilities which were brought into the New GM. , In conjunction with that initiative the amount of goodwill recorded on all of the Motors Holding dealer companies' books was revalued. This resulted in a goodwill write down of $425,000 at Superior Chevrolet to which Glen West agreed. Both Motors Holding and Glen West made a pro-rata donation of shares to off-set the negative impact of the adjustment. The dealer company was reorganized to effectuate the new capital structure.

13    In January, 2010, both Motors Holding and Glen West executed documents related to the reorganization of Superior Chevrolet including a new Stockholders Agreement. A true and correct copy of the Stockholders Agreement which forms the basis of this investment is attached as Exhibit "A". The terms and conditions of this Stockholders Agreement are identical to all of the other Stockholders Agreements which Glen West entered into with Motors Holding. Under Section 3.1 of the Stockholders Agreement, there were seven situations where the Investor, Motors Holding, could elect to exercise its option to purchase the dealer operator's stock. One of those situations was any time that Dealer Company has an "Unrecovered Loss" which exceeds $281,500. This number was agreed to by the parties at the time the agreement was executed. Another situation that would potentially trigger the exercise of the option to purchase the dealer operator's stock was when the dealer operator engaged in fraud, self-dealing or other misconduct. Another situation that could potentially trigger the exercise of the option to purchase the dealer operator's stock was any time that the dealer operator breaches a covenant contained in Article V of the Stockholders Agreement, which covenants included the agreement to maintain the books and records according to the procedures approved by the Board of Directors.

14.    In September, 2010, Motors Holding agreed to provide the Dealer Company with a $500,000 working capital loan in order to pay off a line of credit held by the Dealer Company so that Glen West could get restrictions lifted from his personal accounts which had been imposed by the bank providing the line of credit due to a personal guarantee executed by Glen West prior to Motors Holding's reinvestment in Superior Chevrolet. At that time, Glen West made a donation to capital in the amount of $200,000 in accordance with the terms of the

working capital loan. This donation reduced the Dealer Company's Unrecovered Losses to 8.7 % or approximately $122,000.

15. During a review of the September 30, 2010 Accounting System Exam, a number of questionable expenses paid by the dealer company were identified. For example, there was $20,694 charged as travel and entertainment expense on the Dealer Company's American Express card that were questionable; $35,700 charged as travel and entertainment expense on Bank of America credit cards not related to the dealer company; a $150,000 payment by the Dealer Company for the indebtedness of Mr. West's other business endeavor at Patterson Chevrolet only partially offset by two unidentified deposits totaling $100,000.61 resulting in the use of Dealer Company funds of $49,999.39 for the indebtedness of Mr. West's other business endeavors.

16. These problems were discussed with Mr. West as reflected by Meeting Minutes of the Board of Directors dated December 14, 2010 and January 7. 2011 and letters from the Motors Holding Portfolio Manager, Tim Rinke, dated December 21, 2010 and January 21, 2011. Copies of these letters and meeting minutes are attached as Exhibits "B" through "E."

17 In addition, between September, 2010 and December 31, 2010, the Unrecovered Losses of the Dealer Company grew from $122,000 to $439,519, which exceeds the $281,500 level of Unrecovered Loss in the Stockholders Agreement that could trigger Motors Holding exercising its option to purchase the dealer operator's stock in the Dealer Company.

18. Furthermore, during the investigation into the questionable expenses, it was discovered that the Dealer Company was not maintaining the books and records in accordance with procedures approved by the Board of Directors, including the GM Standard Accounting

Manual. This issue was brought to Mr. West's attention as reflected in the letters and meeting minutes which are attached as Exhibits "B" through "E."

19. On February 8, 2011, because of the self-dealing, commingling of assets, Unrecovered Losses exceeding the amount stated in the Stockholders Agreement and the failure to maintain the books and records in compliance with the obligations set forth in the Stockholders Agreement, Motors Holding decided to exercise its option to purchase Mr. West's stock in the Dealer Company. Mr. West was subsequently removed as a Director, President and employee of the Dealer Company. The reasons for this action were conveyed to Mr. West in person on February 8, 2011 and are memorialized in a letter that was given to him also dated February 8, 2011, a true and correct copy of which is attached as Exhibit "F."

20. When the issue of the questionable American Express charges first came up, Mr. West was asked to provide proper documentation to substantiate the charges. Mr. West had indicated that the documents were located in a storage pod placed at the Patterson Chevrolet site and destroyed when the storage pod roof leaked. Mr. West was only able to provide two (2) original statements covering the periods of November and December, 2010. On February 8, 2011 when Mr. West was removing items that were said to be personal from the dealership, a GM representative noticed dealer company documents. These documents were subsequently retained. Included in those documents were four (4) original American Express statements of the Dealer Company that GM had originally requested of Mr. West, but he said were destroyed.

21. Since February 8, 2011 and before this lawsuit was filed on February 14, 2011, an interim dealer operator has been installed, the employees have been notified of the change in executive management, the bank account signatories of the Dealer Company have been changed and the locks on the dealership have been changed.

I swear that the foregoing is true and correct to the best of my knowledge, information or believe. I understand that the statements made herein are subject to the penalties of perjury if knowingly false.

*Timothy J. Rinke*

Sworn to and Subscribed

Before me this 17th day of February, 2011

*Karen A. Salatino*
Notary Public

KAREN A. SALATINO
Notary Public, State of New York
No. 4957525
Qualified in Westchester County
Commission Expires October 16, 2013